## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

CONTINENTAL RESOURCES, INC., )
        Plaintiff, )
v. ) Case No. CIV-24-463-J
MOUNTAIN STATES PRESSURE )
SERVICE, INC. )
        Defendant. )

## AMENDED COMPLAINT

Plaintiff Continental Resources, Inc. ("Continental") files this Amended Complaint against Defendant Mountain States Pressure Service, Inc. ("MSPSI") and alleges as follows:

## SUMMARY & NATURE OF THE ACTION

1. This action arises from MSPSI's negligence or gross negligence in performing work on an oil and gas well owned by Continental.

2. Continental hired MSPSI to, among other things, remove pipe from a well to facilitate a clean-out process that would unlock millions of dollars in additional revenue.

3. While MSPSI was in the process of removing the pipe, MSPSI dropped the pipe down the well, thousands of feet. MSPSI was contractually required to re-perform its non-conforming work at its own expense. MSPSI accordingly began an operation to "fish" the pipe out of the well. Continental fronted the cost of MSPSI's fishing operation.

4. The operation was unsuccessful. The well is inoperable and a total loss. Worse, MSPSI has refused to pay Continental for the fishing costs.

5. Continental accordingly brings this action to be made whole—to recover the fishing operation costs, its lost profits or the costs of drilling a new well, and other relief.

## PARTIES

6. Continental is a corporation organized under the laws of Oklahoma, with its principal place of business in Oklahoma City, Oklahoma.

7. MSPSI is a corporation organized under the laws of Wyoming, with its principal place of business in Rock Springs, Wyoming.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Continental and MSPSI and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9. Continental is a citizen of Oklahoma for purposes of diversity jurisdiction because it is both incorporated in and maintains its principal place of business in Oklahoma.

10. Conversely, MSPSI is a citizen of Wyoming for purposes of diversity jurisdiction because it is both incorporated in and maintains its principal place of business in Wyoming.

11. This Court has personal jurisdiction over MSPSI because this lawsuit arises out of a contract executed by the parties—a Master Services Agreement (the "MSC")—

that provides in pertinent part that "[a]ny suit or proceeding hereunder shall be brought exclusively in Oklahoma County, Oklahoma, and each Party consents to the personal jurisdiction of the courts, state and federal, located therein." *See* Exhibit 1 – the Master Services Contract ¶ 23.1. MSPSI's execution of the MSC, and work under the MSC, constitute sufficient contacts with the State of Oklahoma for jurisdictional purposes.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts, events, and omissions giving rise to the claims in this lawsuit occurred within the District, or a substantial part of the property that is the subject of the action is situated within this District.

13. Venue in this District is also proper because the parties agreed in the MSC to "waive any objection [that] the state and federal courts of Oklahoma County, Oklahoma are an inconvenient forum." *Id.* ¶ 23.1.

14. Even if venue is not proper under 28 U.S.C. § 1391(b)(2), it is proper under 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

**A.  Continental and MSPSI Execute the MSC.**

15. Continental is a petroleum and natural gas exploration and production company founded in 1967 and headquartered in Oklahoma City.

16. Today, Continental is one of the largest independent oil producers in the country.

17. MSPSI is a snubbing company founded in 1998 and headquartered in Rock Springs, Wyoming.

3

18. MSPSI contracts with companies like Continental to work over and complete natural gas wells, and to provide workover rigs and certain equipment.

19. On December 8, 2021, Continental and MSPSI executed the MSC. *See id.*

20. Under the MSC, MSPSI agreed to, among other things, "provide services, labor, equipment, supplies, tools, manufactured articles, materials, facilities, and/or goods (collectively, 'Work')" requested by Continental. *Id.* ¶ 1.1.

21. Under Section 3.1 of the MSC, MSPSI represented and warranted, among other things, that its "Work shall comply with Continental's specifications applicable to such Work," and "the Work shall be performed in a good and workmanlike manner and consistent with applicable laws and best industry practices." *Id.* ¶ 3.1.

22. Under Section 3.2 of the MSC, MSPSI agreed that, "[i]n addition to all other remedies available to Continental, [MSPSI] shall re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental, or, at Continental's option, promptly refund to Continental the portion of the consideration which is attributable to the non-conforming Work." *Id.* ¶ 3.2.

23. Section 3.2 of the MSC further provides that, "[i]f Continental elects to have [MSPSI] re-perform the non-conforming Work, and [MSPSI] fails to promptly commence or complete such performance to the reasonable satisfaction of Continental, then Continental shall have the right to have the non-conforming Work performed by other means, and [MSPSI] shall be responsible for all reasonable costs incurred in doing so." *Id.*

**B.     Continental Requests That MSPSI Facilitate a Cleanout of the Well.**

24.     Pursuant to and under the MSC, Continental requested and MSPSI agreed to perform certain Work at the Corsican Federal 5-15H oil and gas well (the "Well") located near New Town, Mountrail County, North Dakota.

25.     In November 2022, MSPSI's Work on the Well included facilitating a "cleanout" of the Well (the "Cleanout Process").

26.     Generally, a well "cleanout" involves removing wellbore-fill material, such as sand and other debris, from the wellbore. Such fill material restricts production.

27.     At the time the Cleanout Process began, MSPSI knew and understood that a purpose of the Cleanout Process was to generate additional profit from the Well.

28.     Here, an early step in the Cleanout Process was to remove piping from the Well.

29.     If that piping was not removed from the Well, the Cleanout Process could not be completed unless and until the piping was removed.

30.     As a part of its Work in connection with the Cleanout Process, MSPSI was responsible for removing piping.

31.     MSPSI was also responsible for supplying the equipment it needed to remove that piping from the Well and to otherwise complete its Work in connection with the Cleanout Process.

32.     MSPSI provided, for example, a hydraulic workover rig that was needed to remove piping from the Well.

33. As a part of its Work in connection with the Cleanout Process, MSPSI was responsible for the workover rig and the workover crew.

34. MSPSI retained full control over the workover rig and the workover rig crew throughout the Cleanout Process.

**C.     Instead of Removing Pipe From the Well, MSPSI Drops Pipe Down the Well.**

35. On November 30, 2022, in connection with its Work under the MSC and in connection with the Cleanout Process, MSPSI was in the process of removing pipe from the Well.

36. MSPSI provided all equipment necessary for MSPSI to complete that Work, in accordance with the MSC.

37. The equipment provided by MSPSI included, but was not limited to, the slips that were used in connection with removing pipe from the Well to facilitate the Cleanout Process.

38. Slips are wedge-shaped tools that fit around the body of a drill pipe and are used to suspend the drill string in the drilling hole.

39. Slips generally are controlled by a lever, which opens or closes the wedges to release or grip the drill string.

40. On November 30, 2022, the slip lever at the Well was not a standard-issue handle. Rather, the slip lever was capped with a large spherical ball.

41. At some point during November 30, 2022, MSPSI had removed approximately 280 pipe joints from the Well, with approximately 16 remaining in the

Well. At that point in time, the operator of and/or the entity responsible for the modified slip lever was MSPSI.

42. While MSPSI was operating and/or responsible for the modified slip lever, the slips suddenly opened, and large sections of pipe were released from the slips and plummeted over 8,000 feet down the Well.

43. The dropped pipe significantly damaged Well components and other tangible equipment and property of Continental, including the bottom hole assembly.

44. MSPSI performed a review of the equipment it had been using to remove the pipe from the Well to determine the cause of the slips opening.

45. MSPSI indicated that the equipment was operating as intended.

46. Correspondingly, MSPSI conveyed to Continental that the cause of the slips opening must have been human error on the part of one or more of its employees (and not an equipment malfunction).

47. Continental also conducted an investigation of its own, including speaking with the MSPSI employees involved in the operation.

48. Continental likewise determined that the cause of the slips opening must have been human error (and not an equipment malfunction).

49. At no point during the investigation of the incident did any MSPSI employee indicate that the cause of the pipe dropping was anything other than MSPSI's human error.

50. MSPSI continued to use the same equipment in later operations at the Well with no further instances of the slips opening mistakenly or not operating as intended.

51. Paragraphs 35–50, above, demonstrate that MSPSI's negligence and/or gross negligence caused pipe to drop down the Well. As explained further below, that negligence and/or gross negligence caused extensive property damage and other damage/losses.

**D.     MSPSI Attempts a Fishing Operation to Recover the Dropped Equipment.**

52. Part of MSPSI's Work under the MSC and in connection with the Cleanout Process was to remove pipe from the Well.

53. On November 30, 2022, no person other than MSPSI was responsible for removing pipe from the Well.

54. Continental did not request that MSPSI drop pipe down the Well.

55. To the contrary, Continental requested that MSPSI remove piping from the Well.

56. MSPSI's dropping of pipe down the Well constituted "non-conforming Work" under Section 3.2 of the MSC.

57. After MSPSI dropped the pipe down the Well, Continental elected to have MSPSI re-perform its non-conforming Work.

58. MSPSI agreed to re-perform its non-conforming Work by way of conducting a "fishing operation" to attempt to recover and remove the dropped pipe and any other damaged equipment from the Well.

59. In conformance with Section 3.2 of the MSC and its requirement that MSPSI "re-perform any non-conforming Work at [MSPSI]'s sole expense," Continental indicated to MSPSI that MSPSI would be responsible for paying for the fishing operation

8

and that MSPSI would not be paid for any work performed as a result of the pipe being dropped down the Well. *Id.* § 3.2.

60. MSPSI acknowledged its responsibility for the pipe being dropped down the Well.

61. MSPSI also agreed to work without pay (on "down time") while attempting to fish the dropped equipment from the Well.

**E.  MSPSI's Fishing Operation Failed and the Well is Inoperable.**

62. Several weeks and millions of dollars were spent without successful recovery of the dropped equipment.

63. Eventually, Continental and MSPSI began discussing the pros and cons of each phase of the fishing operation going forward.

64. Throughout this process, MSPSI was aware and understood that it remained responsible for the fishing operation costs, as provided for by Section 3.2 of the MSC and otherwise. *See id.* § 3.2.

65. Indeed, on May 15, 2023, Mr. Josh Sorenson, MSPSI's President, emailed Continental and stated in relevant part, "I want to see Continental reimbursed for fishing expenses and such. It is the only right thing."

66. As the fishing operation costs continued to mount without any further progress towards recovery of the dropped equipment, it became clear that MSPSI was not going to be able to complete performance, and so the fishing operation was suspended.

67. To this day, much of the fallen pipe and other Well components remain at the bottom of the wellbore. As a result, the Well is unable to operate or produce anything of value. The Well is a total loss.

68. In sum, MSPSI did not successfully complete the fishing operation.

69. MSPSI also has not paid any money to Continental to account for the costs and expenses related to the fishing operation, even though the MSC required MSPSI to conduct such work at its "sole expense." *See id.* § 3.2.

70. MSPSI also has not compensated Continental for the costs of re-performing MSPSI's failed Work by other means.

## CAUSES OF ACTION

**A. Count One – Negligence and Gross Negligence**

71. Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

72. MSPSI is a snubbing company that is in the business of using hydraulic workover rigs to service oil and gas wells, operating workover rigs, running wells' bottom hole assemblies, and performing cleanouts of wells, including using slips to remove pipe joints from wells.

73. Accordingly, MSPSI knew or should have known how to operate the slips and other equipment used in connection with the Cleanout Process.

74. MSPSI owed a duty to Continental to conduct its Work in accordance with the way a reasonable and prudent workover rig operator would during snubbing operations and a well cleanout procedure.

75. MSPSI breached that duty by, among other things, using a modified handle on the slips lever and dropping pipe into the Well during the Cleanout Process.

76. MSPSI knew or should have known that using a modified handle on the slips lever could result in that lever being inadvertently activated and releasing whatever material was in the slips at the time. But here, MSPSI used that modified lever anyway.

77. Indeed, MSPSI's actions using a modified slips lever and operating the slips such that pipe was dropped into the wellbore were so flagrant, so deliberate, and so reckless that they are removed from the realm of mere negligence. Instead, MSPSI acted with gross negligence or with reckless disregard for Continental's interests, which caused injury and damages to Continental in excess of this Court's jurisdictional limits, including but not limited to property damage.

78. MSPSI was the cause-in-fact of Continental's damages because but for MSPSI's actions, pipe would not have fallen into the Well, and Continental would not have been injured and suffered loss.

79. MSPSI was the proximate cause of Continental's damages because it was foreseeable that its actions in using a modified handle on the slips lever could result in that lever being inadvertently activated and releasing whatever material was in the slips at the time.

80. As a result of MSPSI's actions, pipe fell into the Well, causing injury and damages to Continental in excess of this Court's jurisdictional limits, including but not limited to property damage.

81. MSPSI acting with gross negligence or with reckless disregard for Continental's interests justifies an award of punitive damages in an amount to be determined pursuant to 23 O.S. § 9.1.

## B. Count Two – Breach of Express Warranty

82. Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

83. MSPSI expressly warranted in the MSC that its Work would be in a good and workmanlike manner and consistent with best industry practices, and that its Work would comply with Continental's specifications. *See id.* §§ 3.1(b)-(c).

84. MSPSI further expressly warranted in the MSC that "all of [MSPSI's] equipment has been thoroughly tested and inspected and is safe." *See id.* § 3.1(f)

85. MSPSI's conduct, including making unapproved alterations to the knob on the slips lever that may have contributed to the opening of the slips, did not comply with Continental's specifications for MSPSI's Work, was not Work performed in a good and workmanlike manner, and did not comply with industry best practices.

86. MSPSI's equipment, including the modified knob on the slips lever, was not thoroughly tested and inspected and safe, as evidenced by the opening of the slips.

87. MSPSI's dropping of pipe down the Well also did not comply with Continental's specifications for MSPSI's Work, was not Work performed in a good and workmanlike manner, and did not comply with industry best practices.

88. As a result of MSPSI's failure to comply with its warranties under the MSC, Continental has suffered injury and damage in excess of this Court's jurisdictional limits.

C. **Count Three – Breach of Contract**

89. Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

90. The MSC is a valid and enforceable contract executed by Continental and MSPSI.

91. Continental has complied with its obligations under the MSC.

92. MSPSI has not asserted that Continental has failed to comply with any of its obligations under the MSC.

93. The MSC requires MSPSI to "re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental."

94. MSPSI's actions in dropping pipe down the Well, rather than removing pipe from the Well, constituted non-conforming Work.

95. MSPSI attempted to re-perform the non-conforming Work by engaging in a "fishing operation" to remove the dropped pipe and any other damaged equipment from the Well.

96. However, the fishing operation was unsuccessful, and the Well is now unable to operate or produce anything of value.

97. MSPSI breached Section 3.2 of the MSC by failing to re-perform the Work to Continental's reasonable satisfaction and at MSPSI's sole expense.

98. As a proximate and foreseeable consequence of MSPSI's breach of its obligations under the contract, Continental has suffered injury and damage in excess of this Court's minimum jurisdictional limits in the form of damage to the Well and Well components caused by pipe falling thousands of feet down the wellbore, loss of use of the damaged Well components, costs of an extensive but unsuccessful fishing operation that MSPSI failed to pay for, and daily mounting lost profits due to the Well being rendered inoperable.

99. Continental is entitled to monetary relief and MSPSI is legally obligated to compensate Continental's losses caused by MSPSI's breach of contract.

### D. Count Four – Declaratory Judgment

100. Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

101. The MSC is a valid and enforceable contract to executed by Continental and MSPSI.

102. Continental has complied with its obligations under the MSC.

103. MSPSI has not asserted that Continental has failed to comply with any of its obligations under the MSC.

104. The MSC requires MSPSI to "re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental."

105. The MSC also states that "[i]f Continental elects to have [MSPSI] re-perform the non-conforming Work, and [MSPSI] fails to promptly commence or complete such performance to the reasonable satisfaction of Continental, then

Continental shall have the right to have the non-conforming Work performed by other means, and [MSPSI] shall be responsible for all reasonable costs incurred in doing so."

106. MSPSI's actions in dropping pipe down the Well constituted non-conforming Work.

107. Continental elected to have MSPSI re-perform the non-conforming Work at MSPSI's expense by authorizing MSPSI to conduct a "fishing operation" to attempt to remove the dropped pipe and any other damaged equipment from the Well, and indicating to MSPSI that MSPSI would be responsible for all expenses associated with the fishing operation.

108. Since the fishing operation was unsuccessful and the Well is therefore unable to operate or produce anything of value, MSPSI breached the MSC by failing to re-perform the Work to Continental's reasonable satisfaction.

109. Continental is therefore entitled to, and respectfully requests, a declaration that it may "have the non-conforming Work performed by other means and MSPSI shall be responsible for all reasonable costs incurred in doing so."  More specifically, Continental seeks a declaration that it may drill a new well, to replace the old Well, and that MSPSI shall be responsible for all reasonable costs incurred in doing so.

## **ATTORNEYS' FEES**

110. Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth in this section.

111. This is a civil action to recover for labor or services rendered.

112. Also, Section 24.1 of the MSC provides that "[i]n the event of any action related to this Contract, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs." *See id.* § 24.1.

113. In bringing this action, Continental has incurred and will incur attorneys' fees.

114. Upon receipt of a favorable judgment, as the prevailing party, Continental will be entitled to and will seek recovery of a reasonable attorney fees under 12 O.S. § 936.

## **JURY DEMAND**

115. Continental demands a jury trial pursuant to Fed. R. Civ. P. 38.

## **PRAYER FOR RELIEF**

WHEREFORE, Continental respectfully requests that this Court grant it the following relief:

    a.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's negligence and gross negligence;

    b.    Judgment awarding Continental punitive damages as a result of MSPSI's gross negligence;

    c.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's breach of express warranty;

    d.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's breach of contract;

e. Declaratory judgment stating MSPSI breached the parties' contract and that MSPSI is responsible for all reasonable costs incurred in drilling a new well;

f. Judgment awarding Continental all reasonable attorneys' fees, expenses, and costs;

g. Judgment awarding Continental pre-judgment and post-judgment interest at the highest legal rate on all sums awarded in the Court's judgment; and

h. All such other and further relief to which Continental may be justly entitled at law or in equity.

Dated May 10, 2024

Respectfully submitted,

*/s/ John (Jake) M. Krattiger*
Brooks A. Richardson, OBA No. 18133
John (Jake) M. Krattiger, OBA No. 30617
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan, Suite 2200
Oklahoma City, OK 73102
Tel: 405-235-5500
Fax: 405-235-2875
brichardson@gablelaw.com
jkrattiger@gablelaw.com


*/s/ Greg Van Houten*
Greg Van Houten (*Admitted Pro Hac Vice*)
District of Columbia Bar No. 1032731
HAYNES AND BOONE, LLP
800 17th Street NW, Suite 500
Washington, D.C. 20006

Tel: (202) 654-4500
Fax: (202) 654-4256
greg.vanhouten@haynesboone.com

and

Neil Issar(*Admitted Pro Hac Vice*)
Texas Bar No. 24102704
Reese Letourneau(*Admitted Pro Hac Vice*)
Texas Bar No. 24137622
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Tel: (214) 651-5000
Fax: (214) 200-0638
neil.issar@haynesboone.com
reese.letourneau@haynesboone.com

**ATTORNEYS FOR PLAINTIFF CONTINENTAL RESOURCES, INC.**