## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CONTINENTAL RESOURCES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: CIV-24-463-J |
| | ) | |
| MOUNTAIN STATES PRESSURE | ) | |
| SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FOURTH AMENDED COMPLAINT

Plaintiff Continental Resources, Inc. ("Continental") files this Fourth Amended Complaint against Defendant Mountain States Pressure Service, Inc. ("MSPSI") and alleges as follows:

## SUMMARY & NATURE OF THE ACTION

1.      This action arises from MSPSI's negligence or gross negligence in performing work on an oil and gas well owned by Continental.

2.      Continental hired MSPSI to, among other things, remove pipe from a well to facilitate a clean-out process that would unlock millions of dollars in additional revenue.

3.      While MSPSI was in the process of removing the pipe, MSPSI dropped the pipe down the well, thousands of feet.  MSPSI was contractually required to re-perform its non-conforming work at its own expense.  MSPSI accordingly began an operation to "fish" the pipe out of the well.  Continental fronted the cost of the fishing operation, which MSPSI promised (contractually and/or orally) to reimburse or otherwise pay for.

4.     The operation was unsuccessful.  The well is inoperable and a total loss. Worse, MSPSI has breached its promise(s) by refusing to reimburse or pay Continental for the fishing costs.

5.     Continental accordingly brings this action to be made whole—to recover the fishing operation costs, its lost profits or the costs of drilling a new well, and other relief.

## PARTIES

6.     Continental is a corporation organized under the laws of Oklahoma, with its principal place of business in Oklahoma City, Oklahoma.

7.     MSPSI is a corporation organized under the laws of Wyoming, with its principal place of business in Rock Springs, Wyoming.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Continental and MSPSI and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.     Continental is a citizen of Oklahoma for purposes of diversity jurisdiction because it is both incorporated in and maintains its principal place of business in Oklahoma.

10.     Conversely, MSPSI is a citizen of Wyoming for purposes of diversity jurisdiction because it is both incorporated in and maintains its principal place of business in Wyoming.

11.     This Court has personal jurisdiction over MSPSI because this lawsuit arises out of a contract executed by the parties—a Master Services Agreement (the "MSC")—that provides in pertinent part that "[a]ny suit or proceeding hereunder shall be brought

2

exclusively in Oklahoma County, Oklahoma, and each Party consents to the personal jurisdiction of the courts, state and federal, located therein." *See* Exhibit 1 – the Master Services Contract ¶ 23.1. MSPSI's execution of the MSC, and work under the MSC, constitute sufficient contacts with the State of Oklahoma for jurisdictional purposes.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts, events, and omissions giving rise to the claims in this lawsuit occurred within the District, or a substantial part of the property that is the subject of the action is situated within this District.

13.    Venue in this District is also proper because the parties agreed in the MSC to "waive any objection [that] the state and federal courts of Oklahoma County, Oklahoma are an inconvenient forum." *Id.* ¶ 23.1.

14.    Even if venue is not proper under 28 U.S.C. § 1391(b)(2), it is proper under 28 U.S.C. § 1391(b)(3).

## **FACTUAL ALLEGATIONS**

**A.    Continental and MSPSI Execute the MSC.**

15.    Continental is a petroleum and natural gas exploration and production company founded in 1967 and headquartered in Oklahoma City.

16.    Today, Continental is one of the largest independent oil producers in the country.

17.    MSPSI was founded in 1998 and is headquartered in Rock Springs, Wyoming. MSPSI offers various oil and gas well services, including those related to well completions, workovers, and fishing operations.

3

18.     MSPSI contracts with companies like Continental to work over and complete natural gas wells, and to provide workover rigs and certain equipment.

19.     On December 8, 2021, Continental and MSPSI executed the MSC.  *See id.*

20.     Under the MSC, MSPSI agreed to, among other things, "provide services, labor, equipment, supplies, tools, manufactured articles, materials, facilities, and/or goods (collectively, 'Work')" requested by Continental.  *Id.* ¶ 1.1.

21.     Under Section 3.1 of the MSC, MSPSI represented and warranted, among other things, that "the Work shall be performed in a good and workmanlike manner and consistent with applicable laws and best industry practices" and that its "Work shall comply with Continental's specifications applicable to such Work."  *Id.* ¶ 3.1.

22.     Under Section 3.1 of the MSC, MSPSI also represented and warranted that "all personnel employed for the Work shall be competent, properly qualified, with skill and experience appropriate to their respective roles, and [MSPSI] shall verify all relevant qualifications of personnel" and "its employees and agents have been trained to follow all applicable laws and to work safely."  *Id.*

23.     Under Section 3.2 of the MSC, MSPSI agreed that "[i]n addition to all other remedies available to Continental, [MSPSI] shall re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental, or, at Continental's option, promptly refund to Continental the portion of the consideration which is attributable to the non-conforming Work."  *Id.* ¶ 3.2.

24.     Section 3.2 of the MSC further provides that, "[i]f Continental elects to have [MSPSI] re-perform the non-conforming Work, and [MSPSI] fails to promptly commence

or complete such performance to the reasonable satisfaction of Continental, then Continental shall have the right to have the non-conforming Work performed by other means, and [MSPSI] shall be responsible for all reasonable costs incurred in doing so." *Id.*

**B.    Continental Requests That MSPSI Facilitate a Cleanout of the Well.**

25.    Pursuant to and under the MSC, Continental requested and MSPSI agreed to perform certain Work at the Corsican Federal 5-15H oil and gas well (the "Well") located near New Town, Mountrail County, North Dakota.

26.    In November 2022, MSPSI's Work on the Well included facilitating a "cleanout" of the Well (the "Cleanout Process").

27.    Generally, a well "cleanout" involves removing wellbore-fill material, such as sand and other debris, from the wellbore.  Such fill material restricts production.

28.    Oil and gas producers routinely cleanout oil and gas wells in order to facilitate further production and thus, further revenue from the well.

29.    Here, an early step in the Cleanout Process was to remove piping from the Well.

30.    If that piping was not removed from the Well, the Cleanout Process could not be completed unless and until the piping was removed.

31.    As a part of its Work in connection with the Cleanout Process, MSPSI was responsible for removing piping.

32.    MSPSI was also responsible for supplying the equipment it needed to remove that piping from the Well and to otherwise complete its Work in connection with the Cleanout Process.

33.    MSPSI provided, for example, a workover rig (the "Rig") that was needed to remove piping from the Well.

34.    As a part of its Work in connection with the Cleanout Process, MSPSI was responsible for the Rig and the workover crew.

35.    MSPSI retained full control over the Rig and the Rig crew throughout the Cleanout Process.

**C.    Instead of Removing Pipe From the Well, MSPSI Drops Pipe Down the Well.**

36.    On November 30, 2022, in connection with its Work under the MSC and in connection with the Cleanout Process, MSPSI was in the process of removing pipe from the Well.

37.    MSPSI provided employees to complete the Cleanout Process.

38.    MSPSI was responsible for training its employees and verifying that each employee was properly qualified, skilled, and experienced for their respective role.

39.    MSPSI provided all equipment necessary for MSPSI to complete that Work, in accordance with the MSC.

40.    The equipment provided by MSPSI included, but was not limited to, the slips that were used in connection with removing pipe from the Well to facilitate the Cleanout Process.

41.    Slips are wedge-shaped tools that fit around the body of a drill pipe and are used to suspend the drill string in the drilling hole.

42.    Slips generally are controlled by a lever, which opens or closes the wedges to release or grip the drill string.

6

43.     Prior to November 30, 2022, one or more MSPSI employees caused the Rig's slips lever knob to be modified or replaced.

44.     As of November 30, 2022, the Rig's slips lever knob was a billiards ball.

45.     No employee or contractor of Continental expressly approved, in writing or orally, the Rig's modified slips lever knob that was in use on November 30, 2022.

46.     At some point during November 30, 2022, MSPSI had removed approximately 280 pipe joints from the Well, with approximately 16 remaining in the Well. At that point in time, the operator of and the entity responsible for the operation of the slips was MSPSI.

47.     While MSPSI was operating and responsible for the slips, the slips opened and pipe was released from the slips and fell over 8,000 feet down the Well.

48.     The dropped pipe significantly damaged Well components and other tangible equipment and property of Continental, including the bottom hole assembly.

49.     MSPSI performed a review of the equipment it had been using to remove the pipe from the Well to determine the cause of the slips opening.

50.     MSPSI indicated that the equipment was operating as intended.

51.     Correspondingly, MSPSI conveyed to Continental that the cause of the slips opening must have been human error on the part of one or more of its employees (and not an equipment malfunction).

52.     MSPSI determined that a potential cause of the incident may have been that, at the time of the incident, due to the set-up of the Rig, the slips operator was unable to

conduct, and did not conduct, an adequate or sufficient visual check or inspection of the slips.

53.    MSPSI also determined that, at the time of the Incident, a Rig operator may have failed to adequately or sufficiently engage the Rig's braking system.

54.    MSPSI further determined that the operator was "preselecting" the slips— that is, prematurely putting the slips in the open position and relying on the weight of the tubing string to hold them closed.

55.    According to MSPSI's Safety Director, the slips operator told his supervisor that he had in fact preselected the slips in the open position in anticipation of latching and lifting the joint.

56.    Preselecting the slips allows the weight of the tubing string to keep the slips closed even though the slips have been placed in an "open" position, but any inadvertent movement or bumping of the tubing in that scenario could cause the slips to open and drop the tubing.

57.    MSPSI also concluded that the operator did not follow standard operating procedure by failing to engage the slip's safety lock.

58.    The safety lock is an additional safety device that locks the slips in place when the string weight alone may not be enough to keep the slips fully engaged.

59.    Continental also conducted an investigation of its own, including speaking with the MSPSI employees involved in the operation.

60.    Continental likewise determined that the cause of the slips opening must have been human error (and not an equipment malfunction).

61.    At no point during MSPSI's investigation of the incident did any MSPSI employee indicate that the cause of the pipe dropping was anything other than MSPSI's human error.

62.    MSPSI continued to use the same equipment in later operations at the Well with no further instances of the slips opening mistakenly or not operating as intended.

63.    Paragraphs 36-62, above, demonstrate that MSPSI's negligence and/or gross negligence caused pipe to drop down the Well.  As explained further below, that negligence and/or gross negligence caused extensive property damage and other damage/losses.

64.    Paragraphs 36-63, above, also demonstrate that MSPSI's employees were not properly trained, skilled, experienced, and/or otherwise qualified to perform their Work, which further validates that MSPSI's negligence and/or gross negligence caused the pipe to drop down the Well and resulted in extensive property damage and other damage/losses.

**D.    MSPSI Attempts a Fishing Operation to Recover the Dropped Equipment.**

65.    Part of MSPSI's Work under the MSC and in connection with the Cleanout Process was to remove pipe from the Well.

66.    On November 30, 2022, no person other than MSPSI was responsible for removing pipe from the Well.

67.    Continental did not request that MSPSI drop pipe down the Well.

68.    To the contrary, Continental requested that MSPSI remove piping from the Well.

69.    MSPSI's dropping of pipe down the Well constituted "non-conforming Work" under Section 3.2 of the MSC.

70.    After MSPSI dropped the pipe down the Well, Continental elected to have MSPSI re-perform its non-conforming Work.

71.    MSPSI agreed to re-perform its non-conforming Work by way of conducting a "fishing operation" to attempt to recover and remove the dropped pipe and any other damaged equipment from the Well.

72.    In conformance with Section 3.2 of the MSC and its requirement that MSPSI "re-perform any non-conforming Work at [MSPSI]'s sole expense," Continental indicated to MSPSI that MSPSI would be responsible for paying for the fishing operation and that MSPSI would not be paid for any work performed as a result of the pipe being dropped down the Well. *Id.* § 3.2. For at least the next several weeks, MSPSI never indicated to Continental that it was not responsible for paying for (or reimbursing Continental for) the costs and expenses of the fishing operation. Instead, suggesting that MSPSI knew it was responsible for those costs and expenses, MSPSI regularly received from Continental updates regarding the costs and expenses of the fishing operation, so that MSPSI could track and project the costs for which it ultimately would be responsible.

73.    MSPSI acknowledged its responsibility for the pipe being dropped down the Well.

74.    Also, whether or not MSPSI was responsible for the fishing operation costs and expenses under the MSC, MSPSI and Continental reached a "handshake deal"—shortly after the incident—pursuant to which MSPSI's President, Josh Sorensen, promised

10

that MSPSI would reimburse or otherwise pay for the fishing operation costs and expenses. At the time of the "handshake deal," MSPSI knew and understood that Continental would rely upon MSPSI's promise; and Continental ultimately did rely upon MSPSI's promise— by incurring significant costs and expenses in connection with the fishing operation—to its detriment.

**E.    MSPSI's Fishing Operation Failed and the Well is Inoperable.**

75.    Several weeks and millions of dollars were spent by Continental without successful recovery of the dropped equipment.

76.    Eventually, Continental and MSPSI began discussing the pros and cons of each phase of the fishing operation going forward.

77.    Throughout this process, MSPSI was aware and understood that it remained responsible for the fishing operation costs, as provided for by Section 3.2 of the MSC and otherwise and/or the parties' "handshake deal." *See id.* § 3.2.

78.    Indeed, on May 15, 2023, Mr. Josh Sorenson, MSPSI's President, emailed Continental and stated in relevant part, "I want to see Continental reimbursed for fishing expenses and such.  It is the only right thing."

79.    As the fishing operation costs continued to mount without any further progress toward returning the well to the state it was in before the incident, it became clear that MSPSI was not going to be able to complete performance and that the Well could not be restored to its pre-incident operational status; so, the fishing operation was suspended.

80.    To this day, components remain at the bottom of the wellbore and/or the well is unable to operate in an unobstructed, normal manner.  As a result, the Well is unable to operate and/or produce anything of material value.  The Well is a total loss.

81.    In sum, MSPSI did not successfully complete the fishing operation.

82.    MSPSI also has not paid any money to Continental to account for the costs and expenses related to the fishing operation, even though the MSC required MSPSI to conduct such work at its "sole expense" and even though MSPSI promised to do so orally. *See id.* § 3.2.

83.    MSPSI also has not compensated Continental for the costs of re-performing MSPSI's failed Work by other means.

## CAUSES OF ACTION

**A.    Count One – Negligence and Gross Negligence**

84.    Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

85.    MSPSI is in the business of, among other things, using hydraulic workover rigs to service oil and gas wells, operating workover rigs, running wells' bottom hole assemblies, and performing cleanouts of wells, including using slips to remove pipe joints from wells.

86.    Accordingly, MSPSI knew or should have known how to operate the slips and other equipment used in connection with the Cleanout Process.

87.     MSPSI owed a duty to Continental to conduct its Work in accordance with the way a reasonable and prudent workover rig operator would during a well cleanout procedure.

88.     MSPSI owed a duty to Continental to ensure that its employees were competent, properly qualified, and with skill and experience appropriate to their respective roles, and further to ensure that its employees have been trained to follow all applicable law and to work safely.

89.     MSPSI breached these duties by, among other things, hiring employees who were inexperienced, insufficiently trained, and/or otherwise unqualified in their respective roles as well as inexperienced in the oil industry generally.

90.     MSPSI breached these duties by, among other things, using a modified slips lever, failing to maintain visual contact with the slips, failing to sufficiently and adequately engage the Rig's braking system, hiring inexperienced employees, failing to train their employees to engage in safe work practices, failing to instruct to employees not to engage in unsafe practices, such as preselecting the slips, and dropping pipe into the Well during the Cleanout Process.

91.     MSPSI knew or should have known that using a modified slips lever knob, failing to maintain visual contact with the slips, failing to sufficiently and adequately engage the Rig's braking system, hiring inexperienced employees, failing to train their employees to engage in safe work practices, and failing to instruct employees not to engage in unsafe practice, such as preselecting the slips, could result in an accident, and specifically an accident where pipe or other material was inadvertently dropped down-well.

Yet, MSPSI still used a modified slips lever knob, failed to maintain visual contact with the slips, failed to sufficiently and adequately engage the Rig's braking system, hired inexperienced employees, failed to train their employees on safe practices, and failed to instruct their employees not to engage in unsafe practices, such as preselecting the slips.

92.    Indeed, MSPSI's actions or inactions in using a modified slips lever knob, setting up the Rig so that the slips operator could not maintain visual contact with the slips, failing to adequately and sufficiently engage the Rig's braking system, hiring inexperienced employees, failing to train its employees on safe practices, failing to instruct its employees not to engage in unsafe practices, and operating the slips such that pipe was dropped into the wellbore were so flagrant, so deliberate, and so reckless that they are removed from the realm of mere negligence.  Instead, MSPSI acted with gross negligence or with reckless disregard for Continental's interests, which caused injury and damages to Continental in excess of this Court's jurisdictional limits, including but not limited to property damage.

93.    MSPSI was the cause-in-fact of Continental's damages because but for MSPSI's actions, pipe would not have fallen into the Well, and Continental would not have been injured and suffered loss.

94.    MSPSI was the proximate cause of Continental's damages because it was foreseeable that its actions in using a modified slips lever knob, setting up the Rig so that the slips operator could not maintain visual contact with the slips, and/or failing to adequately and sufficiently engage the Rig's braking system, could result in an accident where pipe or other material was inadvertently dropped down-well.

14

95.     As a result of MSPSI's actions, pipe fell into the Well, causing injury and damages to Continental in excess of this Court's jurisdictional limits, including but not limited to property damage.

96.     MSPSI acting with gross negligence or with reckless disregard for Continental's interests justifies an award of punitive damages in an amount to be determined pursuant to 23 O.S. § 9.1.

**B.     Count Two – Breach of Express Warranty**

97.     Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

98.     MSPSI expressly warranted in the MSC that its Work would be in a good and workmanlike manner and consistent with best industry practices, and that its Work would comply with Continental's specifications.  *See id.* §§ 3.1(b)-(c).

99.     MSPSI further expressly warranted in the MSC that "all of [MSPSI's] equipment has been thoroughly tested and inspected and is safe."  *See id.* § 3.1(f)

100.    MSPSI's conduct, including making unapproved alterations to the slips lever knob, setting up the Rig so that the slips operator could not maintain visual contact with the slips, and failing to adequately and sufficiently engage the Rig's braking system, did not comply with Continental's specifications for MSPSI's Work, was not Work performed in a good and workmanlike manner, and did not comply with industry best practices.

101.    MSPSI's equipment, including the modified slips lever knob, was not thoroughly tested and inspected and safe, as evidenced by the opening of the slips.

102.    MSPSI's dropping of pipe down the Well also did not comply with Continental's specifications for MSPSI's Work, was not Work performed in a good and workmanlike manner, and did not comply with industry best practices.

103.    MSPSI also expressly warranted in the MSC that "all personnel employed for the Work shall be competent, properly qualified, with skill and experience appropriate to their respective roles, and [MSPSI] shall verify all relevant qualifications of personnel." *See id.* § 3.1(d).

104.    MSPSI further warranted that "its employees and agents have been trained to follow all applicable laws and to work safely." *Id.* § 3.1(e).

105.    MSPSI's conduct, including hiring employees that were inexperienced, insufficiently trained, and/or otherwise unqualified in their respective roles as well as inexperienced in the oil industry generally, did not comply with its duties under the MSC.

106.    MSPSI's conduct in failing to train its employees on safe practices and/or failing to instruct its employees not to engage in unsafe practices, such as preselecting the slips, did not comply with its duties under the MSC to ensure proper qualifications, training, and experience of its employees nor did it comply with MSPSI's duty to ensure that its employees were trained to work safely.

107.    As a result of MSPSI's failure to comply with its warranties under the MSC, Continental has suffered injury and damage in excess of this Court's jurisdictional limits.

## C.    Count Three – Breach of Contract

108.    Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

109.    The MSC is a valid and enforceable contract executed by Continental and MSPSI.

110.    Continental has complied with its obligations under the MSC.

111.    MSPSI has not asserted that Continental has failed to comply with any of its obligations under the MSC.

112.    The MSC requires MSPSI to "re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental."

113.    MSPSI's actions in dropping pipe down the Well, rather than removing pipe from the Well, constituted non-conforming Work.

114.    MSPSI attempted to re-perform the non-conforming Work by engaging in a "fishing operation" to remove the dropped pipe and any other damaged equipment from the Well.

115.    However, the fishing operation was unsuccessful, and the Well is now unable to operate or produce anything of material value.

116.    MSPSI breached Section 3.2 of the MSC by failing to re-perform the Work to Continental's reasonable satisfaction and at MSPSI's sole expense.  Indeed, to date, MSPSI has failed to reimburse or pay Continental for any costs or expenses incurred in the fishing operation.

117.    As a proximate and foreseeable consequence of MSPSI's breach of its obligations under the contract, Continental has suffered injury and damage in excess of this Court's minimum jurisdictional limits in the form of damage to the Well and Well components caused by pipe falling thousands of feet down the wellbore, loss of use of the

damaged Well components, costs of an extensive but unsuccessful fishing operation that MSPSI failed to pay for, and daily mounting lost profits due to the Well being rendered inoperable.

118.    Continental is entitled to monetary relief and MSPSI is legally obligated to compensate Continental's losses caused by MSPSI's breach of contract.

***Breach of Contract Modified by Subsequent Oral Agreement***

119.    Alternatively, to the extent that MSPSI is found not liable for the fishing costs and expenses under the express terms of the MSC, then Continental contends that MSPSI is liable for those same costs and expenses pursuant to their "handshake deal," executed shortly after the incident, which legally operated to modify the terms of the MSC.

120.    MSPSI's President, Mr. Josh Sorensen, reached a "handshake deal" with one or more Continental employees, including (but perhaps not limited to) Mr. JJ Kim, pursuant to which MSPSI agreed to reimburse or otherwise pay for the costs and expenses that Continental incurred in the fishing operation.  To be clear, those Continental employees had Continental's authority to enter into an agreement with MSPSI whereby MSPSI would agree to reimburse or otherwise pay for the costs and expenses that Continental incurred in the fishing operation.

121.    MSPSI knew and understood that Continental would rely upon the "handshake deal," and Continental indeed did rely upon the "handshake deal" when it completed its performance pursuant to the deal by incurring significant costs and expenses in the fishing operation, with the expectation and understanding that it would be reimbursed for the same.

122.    MSPSI, however, breached the MSC, as modified by the parties' "handshake deal," when it refused to reimburse or pay for the costs and expenses that Continental incurred in the fishing operation.

123.    Continental is entitled to monetary relief and MSPSI is legally obligated to compensate Continental's losses caused by MSPSI's breach of contract, as modified by the parties' subsequent oral agreement.

**D.    Count Four – Promissory Estoppel (in the Alternative to its Breach of Contract Claim)**

124.    Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

125.    Shortly after the November 30, 2022 incident at the Well, MSPSI's President, Mr. Josh Sorensen, reached a "handshake deal" with one or more Continental employees, including (but perhaps not limited to) Mr. JJ Kim, pursuant to which MSPSI agreed to reimburse or otherwise pay for the costs and expenses that Continental incurred in the fishing operation.  To be clear, those Continental employees had Continental's authority to enter into an agreement with MSPSI whereby MSPSI would agree to reimburse or otherwise pay for the costs and expenses that Continental incurred in the fishing operation.

126.    At the time of the "handshake deal," MSPSI knew, understood, and foresaw that Continental would rely upon and take action because of MSPSI's promise.

127.    Continental, reasonably relying upon MSPSI's promise to reimburse or otherwise pay for the fishing operation costs and expenses, proceeded to conduct the

19

fishing operation and incur associated costs and expenses.  In other words, Continental performed its obligations pursuant to the "handshake deal."

128.    The fishing operation has since been terminated and Continental's fishing costs and expenses have been reduced to a sum certain—$3,850,038.86.

129.    Continental has demanded that MSPSI reimburse or otherwise pay that sum certain, but MSPSI has refused.

130.    Continental's hardship can only be avoided by the enforcement of MSPSI's promise to reimburse and pay for those costs and expenses.

131.    Continental is therefore entitled to the enforcement of MSPSI's promise and monetary relief, in the amount that Continental spent on the fishing operation.

**E.    Count Five – Declaratory Judgment**

132.    Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth here.

133.    The MSC is a valid and enforceable contract executed by Continental and MSPSI.

134.    Continental has complied with its obligations under the MSC.

135.    MSPSI has not asserted that Continental has failed to comply with any of its obligations under the MSC.

136.    The MSC requires MSPSI to "re-perform any non-conforming Work at [MSPSI]'s sole expense and to the reasonable satisfaction of Continental."

137.    The MSC also states that "[i]f Continental elects to have [MSPSI] re-perform the non-conforming Work, and [MSPSI] fails to promptly commence or complete such

performance to the reasonable satisfaction of Continental, then Continental shall have the right to have the non-conforming Work performed by other means, and [MSPSI] shall be responsible for all reasonable costs incurred in doing so."

138.    MSPSI's actions in dropping pipe down the Well constituted non-conforming Work.

139.    Continental elected to have MSPSI re-perform the non-conforming Work at MSPSI's expense by authorizing MSPSI to conduct a "fishing operation" to attempt to remove the dropped pipe and any other damaged equipment from the Well, and indicating to MSPSI that MSPSI would be responsible for all expenses associated with the fishing operation.

140.    Since the fishing operation was unsuccessful and the Well is therefore unable to operate or produce anything of value, MSPSI breached the MSC by failing to re-perform the Work to Continental's reasonable satisfaction.

141.    Continental is therefore entitled to, and respectfully requests, a declaration that it may "have the non-conforming Work performed by other means and MSPSI shall be responsible for all reasonable costs incurred in doing so."  More specifically, Continental seeks a declaration that it may drill a new well, to replace the old Well, and that MSPSI shall be responsible for all reasonable costs incurred in doing so.

## ATTORNEYS' FEES

142.    Continental hereby incorporates each and every allegation set forth in this Complaint as if fully set forth in this section.

143.    This is a civil action to recover for labor or services rendered.

144.    Also, Section 24.1 of the MSC provides that "[i]n the event of any action related to this Contract, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs." *See id.* § 24.1.

145.    In bringing this action, Continental has incurred and will incur attorneys' fees.

146.    Upon receipt of a favorable judgment, as the prevailing party, Continental will be entitled to and will seek recovery of reasonable attorney fees under 12 O.S. § 936.

## JURY DEMAND

147.    Continental demands a jury trial pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Continental respectfully requests that this Court grant it the following relief:

a.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's negligence and gross negligence;

b.    Judgment awarding Continental punitive damages as a result of MSPSI's gross negligence;

c.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's breach of express warranty;

d.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's breach of contract;

e.    Judgment awarding Continental all damages it has sustained as a result of MSPSI's breach of its promise to reimburse or otherwise pay for Continental's costs and expenses incurred in the fishing operation;

f.    Judgment enforcing MSPSI's promise to reimburse or otherwise pay for Continental's costs and expenses incurred in the fishing operation;

g.    Declaratory judgment stating MSPSI breached the parties' contract and that MSPSI is responsible for all reasonable costs incurred in drilling a new well;

h.    Judgment awarding Continental all reasonable attorneys' fees, expenses, and costs;

i.    Judgment awarding Continental pre-judgment and post-judgment interest at the highest legal rate on all sums awarded in the Court's judgment; and

j.    All such other and further relief to which Continental may be justly entitled at law or in equity.

*        *        *

Dated: October 28, 2024

/s/ *Greg Van Houten*
Counsel for Plaintiff

Greg Van Houten*
District of Columbia Bar No. 1032731
HAYNES AND BOONE, LLP
800 17th Street NW, Suite 500
Washington, DC 20006
Tel: 202-654-4500
greg.vanhouten@haynesboone.com
*Admitted Pro Hac Vice*

Neil Issar*
Texas Bar No. 24102704
Storm Lineberger*
Texas Bar No. 24122681
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
Tel: 214-651-5000
neil.issar@haynesboone.com
storm.lineberger@haynesboone.com
*Admitted Pro Hac Vice*

Brooks A. Richardson
John (Jake) M. Krattiger
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan, Suite 2200
Oklahoma City, OK 73102
Tel: 405-235-5500
brichardson@gablelaw.com
jkrattiger@gablelaw.com

**ATTORNEYS FOR PLAINTIFF CONTINENTAL RESOURCES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants, who are attorneys of record for Defendant Mountain States Pressure Service, Inc.:

Trevor L. Hughes, OBA No. 21229
Jason L. Callaway, OBA No. 31958
JOHNSON & JONES, P.C.
6120 S. Yale, Suite 500
Tulsa, Oklahoma 74136
Tel: 918-584-6644
Fax: 888-789-0940
thughes@johnson-jones.com
jcallaway@johnson-jones.com

*/s/ Greg Van Houten*
Greg Van Houten